UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| GEORGE RODGERS, et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>CENTRAL LOCATING SERVICE, LTD., et al.,<br><br>    Defendants. | CASE NO. C05-1911C<br><br>ORDER |

This matter comes before the Court on Plaintiffs' motion to remand (Dkt. No. 8) and Defendants' motion to transfer (Dkt. No. 9). The Court has considered the memoranda, declarations, and exhibits submitted by the parties, as well as the allegations in the complaint and notice of removal, and determined that oral argument is not necessary. For the reasons that follow, the Court will GRANT Plaintiffs' motion for remand and DENY AS MOOT Defendants' motion to transfer.

I.   FACTUAL BACKGROUND

This case is the third incarnation of a wage-and-hour action alleging that defendant Central Locating Service ("CLS") failed to pay its employees overtime wages for work performed at home and on breaks. CLS is a New York corporation headquartered in Pennsylvania; it primarily provides services to municipalities for locating underground utilities. (*See* Complaint, Dkt. No. 2.) The Plaintiffs in this case are employees of CLS known as "locators" who are responsible for locating and marking underground utilities; the putative class consists of approximately 300 such locators who were employed

ORDER – 1

by CLS in Washington between September 15, 2002 and September 15, 2005. (*Id.* at 2–3, 5.) The record does not reflect how many of these class members remain employed with CLS.

### A.      The Dunwiddie Action

The initial wage-and-hour case against CLS was filed in July 2004 in federal court in the Middle District of Florida (Case No. 5:04-cv-00315-WTH-GRJ [the "Dunwiddie Action"]). The Dunwiddie plaintiffs brought claims against CLS under the federal Fair Labor Standards Act ("FLSA") and sought unpaid overtime compensation, liquidated damages, and a declaration that CLS's violations were willful. (Thieme Decl. Ex. 1 at 10–11.) The plaintiffs alleged that CLS required its locators to conduct a significant percentage of their daily work tasks outside their eight-hour work day, including time spent at home before and after work and during lunch and break times. (*See id.* at 5–9.) Over CLS's objections, the Florida court certified the case in March 2005 as a "collective action" under 29 U.S.C. § 216(b)[1] to include "[a]ll locators who were employed by [CLS] in any of its Regions" who performed unpaid work at home before or after the work day "in any workweek in which they worked in excess of forty (40) hours between October 26, 2001, and the present." (Thieme Decl. Ex. 3 at 4.) Notice was mailed to approximately 3,500 potential class members informing them of their option to join the case; of the 110 Washington residents to whom notice was mailed, 21 chose to opt in. (Thieme Decl. ¶ 16.)

### B.      The First Rodgers Action

In July 2005, lead plaintiff George Rodgers instituted a similar case ("Rodgers I") in this Court alleging substantively identical facts as the Dunwiddie plaintiffs and also seeking relief under the FLSA. (*See* Case No. C05-1278R, Dkt. No. 1.) In September, CLS moved to transfer Rodgers I to Florida for

---

[1] "The FLSA allows for a type of class action, known as a 'collective action,' for employees who are similarly situated to a plaintiff and who file a consent in writing with the court (*i.e.*, 'opt-in' plaintiffs). *See* 29 U.S.C. § 216(b). If employees do not opt-in by filing such consent, they are not bound by the outcome of the collective action and may bring a subsequent private action." *Ballaris v. Wacker Siltronic Corp.*, 370 F.3d 901, 907 n.9 (9th Cir. 2004) (citing *E.E.O.C. v. Pan Am. World Airways, Inc.*, 897 F.2d 1499, 1508 n.11 (9th Cir. 1990)).

ORDER – 2

consolidation with the Dunwiddie Action.  (*Id.* Dkt. No. 15.)  The plaintiffs did not respond to the motion, instead voluntarily dismissing the case without prejudice.  (*Id.* Dkt. No. 16.)

      C.      *The Present Action*

Immediately after their voluntary dismissal of Rodgers I, the current Plaintiffs filed the complaint in this case ("Rodgers II") in King County Superior Court, again seeking unpaid wages and overtime compensation—but this time only under the Washington Minimum Wage Act rather than the FLSA. Plaintiffs also sought exemplary damages, attorneys fees and costs, and injunctive relief.  (*See* Complaint 2–3.)  As in Dunwiddie and Rodgers I, the complaint alleged that CLS "knew or should have known that it was required to pay [its employees] for the work time for which they did not receive compensation, to ensure that [its employees] were completely free from work during their unpaid one-half hour lunch break, and to provide two or more ten minute breaks as required by Washington law." (*Id.* 4–5.)  Plaintiffs further alleged that CLS failed to keep accurate records of the hours worked by its employees.  (*Id.* 5.)  The complaint did not identify whether the generalized prayer for injunctive and declaratory relief applied to its causes of action for unpaid overtime wages, or merely its allegations of record-keeping insufficiencies.

In November, CLS removed Rodgers II from state court pursuant to 28 U.S.C. § 1332(d), as amended by the Class Action Fairness Act of 2005.  (Dkt. No. 1.)  CLS asserted that this Court could exercise diversity jurisdiction because there were more than 100 putative class members, at least one named plaintiff was diverse from CLS, and the aggregated amount in controversy exceeded $5,000,000. (*Id.* at 2.)  Plaintiffs then filed the present motion to remand, arguing that the amount in controversy is below the $5,000,000 jurisdictional threshold.  (Dkt. No. 8.)  Defendants thereafter moved to transfer the case to the Middle District of Florida for consolidation with the Dunwiddie Action.  (Dkt. No. 9.)

      D.      *Status of Washington Plaintiffs in the Dunwiddie Action*

In October 2005, the Dunwiddie plaintiffs moved to dismiss those Washington residents who had opted in to their action in Florida—including four of the five named plaintiffs in Rodgers II.  (Thieme

ORDER – 3

Decl. Ex. 6.) The Washington plaintiffs explicitly referenced the Rodgers II action and disavowed their FLSA claims in favor of a state action under Washington law. (*Id.* at 1.) The magistrate judge recommended that plaintiffs' motion be granted and the Washington opt-ins be left to pursue relief via Rodgers II in state court. However, after CLS removed Rodgers II and moved for transfer, it objected to the magistrate's recommendation that the Washington opt-ins be dismissed. Because of these changed circumstances, the district court returned the motion back to the magistrate for reconsideration. (Dkt. No. 26.) On January 13, 2006, the magistrate judge again recommended that the Washington opt-ins be dismissed from the Dunwiddie Action, finding that no prejudice would result from allowing the Washington opt-ins to pursue their claims separately in state court. (Dkt. No. 28-2.) The fact that CLS had removed Rodgers II to this Court for eventual consolidation with Dunwiddie was not material:

> [That Rodgers II] ultimately might be consolidated pursuant to the first to file rule has no bearing on whether the Washington Plaintiffs should be permitted to voluntarily dismiss their claims [in Dunwiddie]. Its relevance, if any, is to the motion to transfer pending before the Washington court. This motion has not been resolved because before the Washington court can rule on CLS's motion to transfer, it must first resolve Rodgers' motion to remand.

(*Id.* at 6.) The district court has not yet ruled on the magistrate judge's recommendation.

## II. LEGAL ANALYSIS

Plaintiffs seek an order under 28 U.S.C. § 1447(c) remanding this case to King County Superior Court based on a lack of subject matter jurisdiction. Because this is a putative class action in which CLS invokes the Court's diversity jurisdiction, the jurisdictional analysis is guided by 28 U.S.C. § 1332. Under the Class Action Fairness Act of 2005 ("CAFA"), which amended § 1332 to add subsection (d), the Court may exercise jurisdiction if at least one member of a putative class consisting of no fewer than one hundred members is diverse from any defendant, and the aggregated claims of all class members create an amount in controversy in excess of $5,000,000. 28 U.S.C. § 1332(d)(2).

There is no dispute that § 1332(d) applies to this case, and that most of its requirements are met: the parties agree that (1) minimal diversity exists, (2) there is a sufficient number of putative class

ORDER – 4

members, and (3) Plaintiffs' total aggregated claims for actual and double damages and attorneys fees amount to at least $4,124,000.  (*See* Opp'n 1; Reply 1.)  The comparatively narrow remaining jurisdictional issues are twofold: first, whether CAFA altered the traditional presumption against removal jurisdiction, at least as regards certain class actions; and second, whether the Rodgers II complaint seeks injunctive relief that would create costs of compliance to CLS exceeding $876,000, and thus push the total aggregated amount in controversy past the $5,000,000 threshold.

> A.   Did CAFA Alter the Applicable Presumptions and Burdens under 28 U.S.C. § 1332?
>
> > 1.   *Bases for historical presumption against removal jurisdiction*

Before Congress enacted CAFA nearly year ago, the well-established rule in all cases was that district courts were to approach remand motions with a "'strong presumption' against removal jurisdiction" and assign to the removing defendant "the burden of proving the existence of jurisdictional facts [under 28 U.S.C. § 1332(a)]."  *Berry v. Am. Express Publ'g Corp.*, 381 F. Supp. 2d 1118, 1120 (C.D. Cal. 2005) (quoting *Gaus v. Miles, Inc.*, 980 F.2d 564, 556 (9th Cir. 1992).  Under § 1332(a), the presumption against removal jurisdiction applies with particular force to a defendant's arguments that a complaint frames an amount in controversy that exceeds the jurisdictional minimum:

> [I]n cases brought [initially] in federal court . . . [i]t must appear to a legal certainty that the [plaintiff's] claim is really for less than the jurisdictional amount to justify dismissal. . . . A different situation is presented in the case of a suit instituted in a state court and thence removed.  There is a strong presumption that the plaintiff has not claimed a large amount in order to confer jurisdiction on a federal court or that the parties have colluded to that end.

*Gaus*, 980 F.2d at 566 (internal quotations omitted); *see also Sanchez v. Monumental Life Ins. Co.*, 102 F.3d 398, 403 (9th Cir. 1996) (in removal context, "it is incumbent upon the defendant" to make showing that "it does *not* appear to a legal certainty that [plaintiffs'] claim is actually for less than the requisite jurisdictional amount") (internal quotations omitted).  Principles of fairness and judicial efficiency also support this presumption, particularly when jurisdiction rests on the defendant's own calculations of potential exposure under the plaintiffs' claims.  *See Brill v. Countrywide Home Loans, Inc.*, 427 F.3d

ORDER – 5

446, 447–48 (7th Cir. 2005) ("When the defendant has vital knowledge that the plaintiff may lack, a burden that induces the removing party to come forward with the information—so that the choice between state and federal court may be made accurately—is much to be desired."). Such is the case here, where the primary jurisdictional dispute is whether the costs to CLS of complying with an injunction on its pay practices (assuming the complaint requests such an injunction) would exceed the $876,000 needed to raise the amount in controversy over the $5,000,000 threshold. (*See* Reply 1.)

### 2. *Post-CAFA removal jurisdiction over large class actions*

CLS argues that these traditional presumptions and burdens do not apply because its removal petition is based not on § 1332(a), but on § 1332(d) as amended by CAFA. The statutory amendments enacted by CAFA in February 2005 require a number of changes to the traditional jurisdictional analysis as applied to certain large class actions: specifically, subsection (d) now incorporates the previously disfavored concepts of minimal diversity and aggregated amounts in controversy. *See* 28 U.S.C. § 1332(d)(2), (6); *Bush v. Cheaptickets, Inc.*, 425 F.3d 683, 684 (9th Cir. 2005); *see also Hiivala v. Wood*, 195 F.3d 1098, 1103 (9th Cir. 1999) (courts must presume that express statutory revisions indicate congressional intent to change the law). Beyond these express statutory revisions, CLS argues that CAFA also reversed the presumption against removal jurisdiction by requiring plaintiffs opposing removal to disprove the existence of jurisdictional prerequisites. (Mot. 4–6.) CLS argues that this conclusion is "evident from the terms of the statute" (*id.* at 5), but the amended text of § 1332 reveals no additions, omissions, or alterations demonstrating any congressional intent to alter the long-standing presumptions and burdens applicable to remand motions. CLS has not identified, nor can the Court locate, anything in the text of § 1332(d) creating a new presumption in favor of removal jurisdiction or relieving the defendant of its burden of persuasion.

The question thus becomes, should the Court interpret Congress's silence as enacting an implicit change to the well-established presumption against removal jurisdiction? In the usual course, attempting "to divine congressional intent from congressional silence" is "an enterprise of limited utility that offers a

ORDER – 6

fragile foundation for statutory interpretation." *Polar Bear Prods., Inc. v. Timex Corp.*, 384 F.3d 700, 717 (9th Cir. 2004). But because § 1332 has *always* been silent on the applicable presumptions and burdens, both before and after CAFA, the presumption against removal jurisdiction must be considered a judicial gloss on the original (silent) statutory language. *See* 14B CHARLES A. WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 3721 at 324 (3d ed. 2005) (citing "ample support" "at all levels of the federal courts—the Supreme Court, the courts of appeal, and the district courts—for the proposition that removal statutes will be strictly construed"). This has led at least one district court to conclude that Congress need not have explicitly addressed the negative presumption to effect a change:

> The Court notes, with some irony, that the original diversity statute does not contain any reference to the burden of proof. Plaintiff fails to explain how the failure to incorporate the burden of proof in Section 1332(d) should be assigned more or less meaning than the failure to incorporate any burden of proof into the original text. In these circumstances, the Court finds that the failure to explicitly legislate changes on the burden of proof in interstate class actions has little interpretive value.

*Berry*, 381 F. Supp. 2d at 1122–23. This conclusion assumes that the silence in the original text is the only meaningful law against which to judge CAFA's effect. In other words, if there were no consistent record of case law interpreting § 1332 to include the presumption against removal jurisdiction, Congress would have no reason to know of that presumption and, therefore, no reason to include express statutory language to the contrary.

But Congress did not enact CAFA in a vacuum. There is a uniform body of precedent applying a clear presumption against removal in this and every other circuit. *See* 14B WRIGHT ET AL., *supra*, § 3721 at 324 (noting that "federal courts have held on innumerable occasions . . . that the defendant has the burden of establishing to the district court's satisfaction . . . that removal is proper"). It is incomprehensible that Congress was unaware of this substantial body of case law when it drafted CAFA. *See United States v. Male Juvenile*, 280 F.3d 1008, 1016 (9th Cir. 2002) ("In construing statutes, we presume Congress legislated with awareness of relevant judicial decisions."). And yet CAFA was enacted without express changes to the negative presumption the courts have applied in the removal context for

ORDER – 7

several decades. *See, e.g.*, *Wilson v. Republic Iron & Steel Co.*, 257 U.S. 92, 97 (1921) (noting that "petitioning defendant must take and carry the burden of proof" for removal purposes). When a consistent statutory interpretation has been so long settled, the courts are justifiedly reluctant to read a repeal of that interpretation into a statutory amendment that is completely silent on the subject. *Cf. Globe & Rutgers Fire Ins. Co. v. Draper*, 66 F.2d 985, 991 (9th Cir. 1933) (noting that "repeals by implication are not favored"); *Pierce v. Underwood*, 487 U.S. 552, 567 (1988) (reenactment of statute that had been given "consistent judicial interpretation" is deemed to incorporate "the settled judicial interpretation"). The Court concludes, therefore, that the specific textual amendments to § 1332 left intact the well-founded presumption against removal jurisdiction.

### 3. *Interpretive value of CAFA's legislative history*

In the absence of express or implied statutory revisions, CLS argues that the text of § 1332(d) is so ambiguous that the Court must turn to CAFA's legislative history for guidance. (Opp'n 4–6.) In doing so, CLS relies heavily on Chief Judge Lasnik's recent opinion, which found that "notwithstanding the absence of specific statutory provisions, it is not difficult to divine Congressional intent from CAFA's legislative history." *Waitt v. Merck & Co.*, No. C05-0759L, 2005 WL 1799740, at *1 (W.D. Wa. Jul. 27, 2005). Quoting extensively from the Senate Judiciary Committee's post-enactment report on CAFA, Chief Judge Lasnik concluded that under § 1332(d), "'[i]f a purported class action is removed pursuant to these jurisdictional provisions, the named plaintiff(s) should bear the burden of demonstrating that the removal was improvident (*i.e.*, that the applicable jurisdictional requirements are not satisfied).'" *Id.* (quoting S. Rep. No. 109-14, at 42 (2005), reprinted in 2005 U.S.C.C.A.N. 3, 40 [hereinafter "Committee Report"]). This followed other recent district court rulings—each of which relied on the same language from the same Committee Report—that CAFA implicitly reversed both the presumption against removal jurisdiction and the removing defendant's burden of establishing jurisdiction. *See, e.g.*, *Berry*, 381 F. Supp. 2d at 1122–23; *Natale v. Pfizer, Inc.*, 379 F. Supp. 2d 161, 168 (D. Mass 2005).

ORDER – 8

The Court respectfully disagrees with the method of statutory interpretation employed by these decisions.[2] Courts are certainly entitled to rely on legislative history *after* a statute is deemed ambiguous on its face. *United States v. Curtis-Nev. Mines, Inc.*, 611 F.2d 1277, 1280 n.1 (9th Cir. 1980). But the courts' initial task is always to interpret the words of the statute as Congress has enacted them. *See United States v. Dangdee*, 616 F.2d 1118, (9th Cir. 1980) (statutory language is "best evidence of congressional intent because we must assume that Congress meant what it said") (internal quotations omitted)). Accordingly, in the absence of ambiguity in the plain language of the statute, the courts need look no further for interpretive aids. *See Hertzberg v. Dignity Partners, Inc.*, 191 F.3d 1076, 1081 (9th Cir. 1999). Moreover, the need for legislative history is particularly low when the courts have applied a consistent interpretation to the statute in question. *Cf. Portland Audubon Soc'y v. Lujan*, 884 F.2d 1233, 1238 n.4 (9th Cir. 1989) (deeming it appropriate to consult legislative history that did *not* "contradict any prior judicial interpretation" of reenacted statute).

Applying these principles of statutory interpretation to § 1332 as a whole, the Court finds that Congress's failure to explicitly address the long-standing jurisdictional burdens in removal cases does not create an ambiguity requiring resort to CAFA's legislative history. Under the preamendment version of § 1332, it was undisputed that the removing defendant bore the burden of establishing federal jurisdiction; congressional silence on that issue does not render the statute ambiguous. As another district court recently concluded, "[t]he omission of a burden of proof standard in the CAFA does not create an ambiguity inviting courts to scour its legislative history to decide the point":

> By failing to specifically address the burden of proof in the Act, especially in light of discussing the issue in a Committee Report, Congress is deemed to have not intended to change the settled case law on that issue. Had Congress wished to change which party bears the burden of proof in a removal action under the CAFA it could have explicitly done so.

---

[2] *See Starbuck v. City & County of S.F.*, 556 F.2d 450, 457 n.13 (9th Cir. 1977) ("The doctrine of *stare decisis* does not compel one district court judge to follow the decision of another.").

ORDER – 9

*Judy v. Pfizer, Inc.*, No. 4:05-CV-1208-RWS, 2005 WL 2240088, at *2 (E.D. Mo. Sept. 14, 2005). The Court agrees that the amended text of § 1332 does not mandate reliance on legislative history—particularly a Committee Report that is of questionable utility in both form and substance.[3]

In sum, there is no basis to conclude that CAFA imposed new presumptions and burdens by silent implication or through bare legislative history. Consistent with CAFA's express amendments and the courts' long-settled removal jurisprudence, it remains CLS's burden to overcome the presumption against removal and to establish the prerequisites for federal jurisdiction under § 1332(d).

   B.   *Amount in Controversy Arising From Plaintiffs' Request for Injunctive Relief*

Unless it is facially evident from the complaint that the jurisdictional threshold amount is actually in controversy, the removing defendant must prove by a preponderance of the evidence that the jurisdictional minimum is met. *Valdez v. Allstate Ins. Co.*, 372 F.3d 1115, 1117 (9th Cir. 2004) (addressing pre-CAFA § 1332). "Because the plaintiff instituted the case in state court, '[t]here is a strong presumption that the plaintiff has not claimed a large amount in order to confer jurisdiction on a federal court.'" *Singer v. State Farm Mut. Auto. Ins. Co.*, 116 F.3d 373, 375 (9th Cir. 1997) (quoting *St. Paul Mercury Indem. Co. v. Red Cab. Co.*, 303 U.S. 283, 290 (1938)). Conclusory allegations by the defendant will not suffice to overcome the traditional presumption against removal jurisdiction. *Id.* Instead, the courts may look beyond pleadings and consider other evidence relevant to the amount in controversy, tested as of the time of removal. *Kroske v. U.S. Bank Corp.*, 432 F.3d 976, 980 (9th Cir.

---

[3] As the Seventh Circuit aptly noted, the oft-quoted language in the Committee Report does not refer to any specific textual amendments to § 1332(d): "when the legislative history stands by itself, as a naked expression of 'intent' unconnected to any enacted text, it has no more force than an opinion poll of legislators." *Brill*, 427 F.3d at 448; *see also Orca Bay Seafoods v. N.W. Truck Sales, Inc.*, 32 F.3d 433, 436 (9th Cir. 1994) (courts must rely on "operative words of the statute" rather than generic legislative "purpose"). The Court is particularly disinclined to assign interpretive value to a report that was released only after the law's enactment, and thus was not available for review by the Senate before voting. *See* S. Rep. No. 109-14, at 79 (Additional Views of Senator Patrick Leahy ("That this report is being filed after Senate consideration means that it did not serve the principal purpose for which Committee reports are intended.")).

ORDER – 10

2005). The defendant's evidence must show that it is "more likely than not" that at the jurisdictional amount is in controversy. *Singer*, 116 F.3d at 375.

### 1. Amount in controversy evidenced from the face of the complaint

The jurisdictional inquiry here is quite narrow: whether the Rodgers II complaint contains a request for injunctive relief that would require CLS to expend enough in compliance costs to push the amount in controversy beyond the $5,000,000 threshold. At the outset, it is not evident from the face of the complaint that Plaintiffs' request for injunctive relief would (if successful) require CLS to pay any additional amounts. Plaintiffs' primary claims seek money damages under Washington law for CLS's failure to pay overtime wages to the putative class of 300 current and former employees. (Complaint 2.) The complaint clearly identifies the Plaintiffs' prayer for monetary relief (both compensatory and exemplary damages) as applying solely to their unpaid-wage claims. (*Id.* 9.) This makes sense as applied to a fixed class of workers during a fixed class period who, in turn, worked a calculable number of overtime hours. (*See* Reply 5.) Accordingly, the complaint expressly alleges that the total aggregated amount in controversy of all class members does not exceed $5,000,000. (Complaint 6.) There is no suggestion by CLS nor any indication in the record that this allegation was made in bad faith. Accordingly, "the sum claimed by the plaintiff controls for removal purposes" as to the maximum amount in controversy. *Singer*, 116 F.3d at 375 (internal quotes omitted).

However, the complaint also includes a generalized prayer for injunctive relief, without indicating whether the injunction would apply to its causes of action for unpaid overtime. (Complaint 9.) Plaintiffs argue that the injunction relates only to their record-keeping claim (for which there is no adequate remedy at law), and would serve little use as applied against CLS's future pay practices when the putative class encompasses only employees of CLS during a specified period. (*See* Mot. 7–8; Reply 3.) And the parties agree that injunctive relief is not available as to future employees. Accordingly, Plaintiffs do not seek certification under Washington Civil Rule 23(b)(2), which tracks the federal rules by permitting class certification where the primary claim for relief is injunctive or declaratory in nature. Nor have (or could)

ORDER – 11

Plaintiffs assert that they lack an adequate remedy at law for their claims for money damages. Thus, the Court does not discern in the complaint a request for injunctive relief relating to the Plaintiffs' claims for unpaid overtime wages. *See Merrell Dow Pharm., Inc. v. Thompson*, 478 U.S. 804, 809 n.6 (1986) ("Jurisdiction may not be sustained on a theory that the plaintiff has not advanced.").

        2.    *CLS's evidence of compliance costs arising from a potential injunction*

Even assuming that the complaint does request injunctive relief relating to CLS's pay practices, CLS has failed to demonstrate that such an injunction would affect the amount in controversy. In its notice of removal, CLS asserts that the complaint can only be understood to seek an injunction forcing CLS to disgorge unpaid overtime wages on an annual basis: "Plaintiffs seek injunctive relief to require that CLS pay the claimed amounts on a permanent basis following trial." (Dkt. No. 1 at 5; Opp'n 7–9.) Under CAFA, the total relief sought by all class members is aggregated for purposes of evaluating the $5,000,000 jurisdictional threshold. 28 U.S.C. § 1332(d)(6). And the "value" of injunctive relief is determined by calculating the defendant's costs of compliance: "where the value of a plaintiff's potential recovery . . . is below the jurisdictional amount, but the potential cost to the defendant of complying with the injunction exceeds that amount, it is the latter that represents the amount in controversy for jurisdictional purposes." *In re Ford Motor Co.*, 264 F.3d 952, 958 (9th Cir. 2001).

CLS argues that the requested injunction will require them to pay currently employed class members an "annual claim rate" over ten years: "Multiplying the annual claim rate of $421,401 (before doubling) by just ten years yields an amount in controversy with respect to Plaintiffs' claim for injunctive relief of $4,214,008." (Dkt. No. 1, at 5.) In reaching this conclusion, CLS relies entirely on the declaration of Edward Crocker, the District Manager for CLS locators in Washington. (Dkt. No. 6.) Crocker makes a number of generalized or conclusory statements about the amount of overtime that the locators would likely work in the future. (*Id.*) For example, he states that locators have "generally resided approximately 30 to 45 minutes from their assigned work areas," that uncompensated weekly meetings "typically last about 30 minutes," and that he anticipates CLS's staffing and hours will remain

ORDER – 12

constant "for the foreseeable future." (*Id.*) Yet Crocker makes no representations that any of the class members are still employed with CLS, or will remain so for a sufficient time to support his estimates.

These tenuous assumptions are not sufficient to support CLS's contention that an injunction against CLS's pay practices would (1) affect a determinate number of class members, (2) who would remain employed with CLS and (3) incur a consistent amount of commuting or meeting time, (4) resulting in a predictable number of overtime hours and (5) corresponding payments by CLS, (6) over at least 25 months. CLS has failed to meet its burden of establishing that an injunction against its pay practices would result in compliance costs exceeding $876,000, and thus that the total aggregated amount in controversy exceeds $5,000,000.

### III. CONCLUSION AND ORDER

For the foregoing reasons, Plaintiff's motion to remand is GRANTED based on a lack of subject matter jurisdiction under 28 U.S.C. § 1332. The Court therefore ORDERS that this case be REMANDED to King County Superior Court. The Court further DENIES AS MOOT CLS's motion to transfer this matter to the Middle District of Florida.

SO ORDERED this 1st day of February, 2006.

/s/ John C. Coughenour
UNITED STATES DISTRICT JUDGE

ORDER – 13